```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PERLEY J. THIBODEAU,                             :

                        Plaintiff,               :

        -against-                                :   REPORT AND RECOMMENDATION

COMMISSIONER OF SOCIAL SECURITY,                 :       10 Civ. 6360 (PGG)(KNF)

                        Defendant.               :
------------------------------------------------------------X
```

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE PAUL G. GARDAPHE, UNITED STATES DISTRICT JUDGE

## BACKGROUND

Perley J. Thibodeau ("Thibodeau"), proceeding pro se, commenced this action against the Commissioner of Social Security ("Commissioner"), seeking review of the decision finding him ineligible for retirement insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-434. The Commissioner answered. Thereafter, the Commissioner filed a motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Thibodeau opposed the motion.

## BACKGROUND

*Procedural History*

On June 3, 2002, Thibodeau filed an application for retirement benefits with the Social Security Administration, which was denied because Thibodeau's covered earnings did not equal the forty quarters of coverage that would entitle him to retirement benefits. On March 23, 2007, the district court granted the Commissioner's motion for judgment on the pleadings, affirming the Commissioner's decision denying Thibodeau's application for retirement benefits and,

1

subsequently, denied Thibodeau's motion for reconsideration. On July 31, 2009, the Second Circuit Court of Appeals vacated the judgment and remanded the matter to the district court with instructions to remand the matter to the Commissioner for proceedings consistent with the Second Circuit's order. The Second Circuit found that the administrative law judge ("ALJ") "should have developed a more comprehensive record before making his decision" because he: (1) did not help Thibodeau cure the problem occasioned by the lack of documentation reflecting any customers Thibodeau had or the services he rendered, as a self-employed hairdresser, during the time in question; and (2) cut short Thibodeau's testimony relevant to the four factors required by the regulations to be considered when determining the existence of a trade or business. On June 25, 2010, after conducting a hearing upon remand, the ALJ denied Thibodeau's claim. This action followed.

*Record Evidence*

Thibodeau was born in 1940. (Tr. 186). On June 6, 2002, Thibodeau completed a Statement of Self-employment Income form, indicating that he "cut, washed and styled six customers' hair for $150 each, plus tip. My expenses for shampoo, etc. ran to $70. I don't expect to work any more this year because of problems using my hands and arms." (Tr. 188). On that form, Thibodeau stated that his net income, for the period April 1, 2002, to June 1, 2002, was $875, after deducting $70 for expenses. (Tr. 188). On April 24, 2004, the defendant sent a letter to Thibodeau, inquiring whether he: (a) worked as a hairdresser prior to 2002; (b) had any training; (c) was licensed; and (d) had any records, such as an appointment calendar or a list of customers. (Tr. 184). The letter also asked Thibodeau to explain why no expenses were shown on his 2002 tax return, what type of services he offered in his business, where he conducted his business and to submit statements from any clients or business contacts who could attest to his

work as a hairdresser. (Tr. 184). Thibodeau responded that he had not worked as a hairdresser since 1974, when he worked two to three months, and he was no longer a licensed hairdresser. (Tr. 184). He stated that he was trained at D'Lor School of Cosmetology in Brewer, Maine, and graduated therefrom in September 1974. (Tr. 184). Thibodeau stated he did not renew his license because he was unable to work. (Tr. 184). Concerning his expenses for 2002, Thibodeau explained that initially, he listed his expenses "on Schedule C-EZ of [his] 2002 tax return," but did not do so on his amended return. (Tr. 184). Thibodeau reported that he cut several women's hair at a friend's apartment. (Tr. 184). He explained that he kept no records in connection with his customers because they were "friends of a friend," and that it was a "1 time deal." (Tr. 184).

     At the initial hearing, conducted on September 19, 2005, Thibodeau testified that he had eight customers, on two occasions in 2002. (Tr. 91, 92). He performed work in a friend's apartment and was paid in cash. (Tr. 91). He stated these customers, who were friends of a friend, "knew of what I was trying to do with my Social Security." (Tr. 91). He testified that he had never seen these clients after he did their hair. (Tr. 92). He also stated that he was trying to have a regular business going and that is why he filed an estimated income tax, but, subsequently, he developed problems with his heart and had double bypass heart surgery. (Tr. 92-93). Thibodeau explained that he amended his 2002 tax return to correct the errors on his original 2002 tax return because the person who completed his original 2002 tax return deducted his expenses and stated that Thibodeau was paying for his utilities, when he did not. (Tr. 94). He also stated that one of his eight clients, identified only as "Evelyn," whom Thibodeau "didn't think . . . was going to pay me did pay me $120." (Tr. 94). Thibodeau's 2002 income tax return indicated that his state adjusted gross income was $813, but his 2002 amended income tax return indicated it was $1,018. (Tr. 33).

3

At the hearing upon remand, conducted on June 7, 2010, Thibodeau submitted additional documents, consisting of calendar pages for May and June 2002, a list of customers and what appears to be a record of the work he performed in 1973, as well as copies of a check for $10 used to obtain that record. (Tr. 159-62). Thibodeau testified that he wrote his clients' names in the calendar "at the time." (Tr. 194). He stated that, as noted in his calendar, on May 20 and 21, 2002, he provided haircuts to eight women at the apartment of a friend and charged each $150. (Tr. 202, 213, 215). He explained that he obtained his clients by word-of-mouth and that his friend obtained clients for him from a local pub. (Tr. 221-22). Thibodeau recalled that he "didn't file a tax return until after [Evelyn] paid me. I had the full amount . . . when the man . . . made out my income tax." (Tr. 196-97).

According to Thibodeau, his tax preparer deducted expenses for shampoo. (Tr. 195). He realized later that the tax preparer had made a mistake in claiming heat and light as expenses, because he did not need those deductions, since they are included in his rent. (Tr. 197). Thibodeau explained that he amended his tax return "in order to give the money back to the state and when I did, . . . I didn't want to take out the supplies because as it turned out, it was stuff that I had already . . . in the house . . . so I didn't have [an] actual expenditure." (Tr. 197). Thibodeau stated that, originally, the tax preparer insisted he deduct expenses, which lowered his income level below the amount needed to obtain one more quarter of coverage. (Tr. 199). He also stated that he could choose whether to deduct expenses. (Tr. 197).

The ALJ asked Thibodeau why he reported "gross receipts" of $1,095 instead of $1,200, which would be the total earned if eight clients paid $150 each. (Tr. 202-03). Thibodeau was not able to explain this discrepancy. (Tr. 203-05). He testified that the difference between his "gross receipts total of $945" on the original return and $1,095 on the amended return was $150,

4

the amount the last of the eight clients paid him after he filed his tax return.  (Tr. 203-05).

The ALJ inquired into Thibodeau's health at the time he worked in May 2002 and thereafter.  (Tr. 209-10, 213-14).  Thibodeau testified that working two days in May 2002 destroyed his health.  (Tr. 213).  He explained that, "sometime between May and November 2nd," he had "a double heart attack and double bypass operation."  (Tr. 213, 223-24).  The ALJ inquired of Thibodeau why he did not cut any hair in June 2002, as his calendar showed he had various activities during that month.  (Tr. 224-25).  Thibodeau answered that, although the June 2002 notations indicate scheduled activities, the notations do not mean that he participated in those activities.  (Tr. 226).

*The ALJ's Decision*

On June 25, 2010, the ALJ issued his decision upon remand.  (Tr. 111-17).  The ALJ stated that the issue was whether Thibodeau earned the fortieth quarter of coverage necessary for entitlement to benefits under Title II.  (Tr. 112).  The ALJ found that Thibodeau: (1) had thirty-nine quarters of coverage, prior to May 2002; (2) did not have a bona-fide trade or business in 2002, because he failed to establish hairdressing as his regular occupation or calling; (3) did not have self-employment income in an amount sufficient to earn any quarter of coverage in 2002, because the actual income he derived in 2002 as well as his business expenses were questionable and his testimony was not credible; and (4) did not attain fully insured status.  (Tr. 114-17). The ALJ credited Thibodeau's testimony that he held himself out to others as being engaged in the hairdressing business and his "work activity in 2002 was perhaps undertaken in good faith with the intention of making a profit or producing income."  (Tr. 114).  However, the ALJ noted that "the documentation of the earnings gained from said activity . . . is questionable."  (Tr. 114). For example, the ALJ observed that: (a) Thibodeau's earning record reflected no activity after

5

1974; (b) no regularity existed in his business activity because he testified that he did not work prior or subsequent to May 20 and 21, 2002, and the May 2002 work was a "1 time deal"; and (c) the level of his impairment pointed to an inability to perform basic work activity. (Tr. 114-15). The ALJ noted that Thibodeau's calendar indicated "a host of activities that he engaged in [during] May and June 2002. . . . He testified that he did not necessarily engage in the activities noted on the calendar, however, that would bring into question whether he actually engaged in work activity noted on said calendar for May 20 and 21."

With respect to the amount of Thibodeau's self-employment income, the ALJ noted that Thibodeau's 2002 amended tax return indicated gross receipts of $1,095 and net earnings of $1,012. (Tr. 115). Thibodeau testified numerous times that he performed work on eight clients, charging each $150, which equals $1,200. (Tr. 115). However, the ALJ noted, he submitted an itemized list of his work on the dates in question, indicating only seven clients. (Tr. 115). Thibodeau testified, at the hearing upon remand, that Evelyn paid him $150, but he testified previously that she paid him $120. (Tr. 115). Thus, discrepancies existed in the number of clients and the amount of payment he actually received. (Tr. 115). Moreover, the ALJ noted that the actual amount of his business expenses was questionable because he first reported his business expenses were $70 but testified his business expenses were $50 to $69. (Tr. 115). Thibodeau indicated on his tax return that he did not report expenses because he could not locate his receipts. (Tr. 115). He maintained that "it is his prerogative to deduct business expenses from his gross earnings. However, for purposes of Social Security, business expenses must be deducted to determine countable income and entitlement to benefits." (Tr. 115-16).

The ALJ also found Thibodeau's credibility was suspect. (Tr. 116). For example, Thibodeau indicated, in 2004, that he had no record of his work activity, such as calendars or a

list of customers, but he produced the May and June 2002 calendars and the corresponding list of customers at the hearing upon remand. (Tr. 116). Thibodeau testified that "he did not necessarily engage in all activities indicated on his calendar" and "repeatedly indicated that he did hair for 8 individuals, yet the list submitted shows 7 individuals. His friend Berndardette's name, who [sic] he testified that he serviced, is not listed as one of his customers." (Tr. 116). Moreover, the ALJ noted that Thibodeau testified that he was able to work from 7:30 p.m. to 12:00 a.m. on two consecutive days cutting, coloring, washing and perming the hair of several customers, which involves activities inconsistent with the level of impairment alleged by him. (Tr. 116). The ALJ also noted that, when questioned about the discrepancies in the evidence, Thibodeau "became insulting, belligerent and uncooperative, refusing to answer the questions posed." (Tr. 116). Furthermore, Thibodeau asserted he was unable to remember the specific details of events occurring eight years ago. (Tr. 116). However, throughout the hearing on remand, he was able to recall names and places, past conversations and other details regarding events that occurred recently as well as those occurring over eight years ago. (Tr. 116). The ALJ stated that it was his duty "to investigate behind the form of self-employment tax returns which an individual has filed." (Tr. 116). As Thibodeau failed to substantiate the amount of self-employment income reported and his income was not verifiable, he did not obtain an additional quarter of coverage, through his work activity in 2002, and did not attain fully insured status. (Tr. 116).

*Motion for Judgment on the Pleadings*

In his complaint, Thibodeau asserted that the ALJ's decision was not supported by substantial evidence and was contrary to law. In his motion, the Commissioner contends that substantial evidence supports the ALJ's finding, that Thibodeau was not engaged in bona-fide

self-employment, and the ALJ considered, properly, the four factors required to be considered in making that determination. While the ALJ accepted that Thibodeau advertised his trade by word-of-mouth, he found, properly, that his hairdressing activity was not regular, based on, <u>inter alia</u>, Thibodeau's own testimony that he worked only two days in 2002 and never again earned money by providing hairdressing services and that it was a "1 time deal." He also testified that his customers "knew what [he] was trying to do with Social Security," conceding that his work was not performed on a regular basis. The Commissioner contends that substantial evidence supports the ALJ's finding that Thibodeau did not have sufficient self-employment income because he produced no receipts or statements from his customers and he was unable to explain the discrepancy between his statements and his amended tax return. Additionally, the list of customers produced by Thibodeau was inconsistent with his testimony about his customers. Moreover, he testified inconsistently about when he received Evelyn's payment. The ALJ noted that Thibodeau's allegations concerning his business expenses were inconsistent because he testified that he had supplies at home and did not have actual expenditure, where the record shows he did not perform any work since 1974, making it unlikely that he had supplies at home for doing work in May 2002. The Commissioner contends the ALJ found properly that Thibodeau's testimony was not entirely credible. In particular, the Commissioner highlighted the inconsistency between the documents in the record and Thibodeau's testimony. The ALJ also noted the inconsistency between the level of impairment alleged by Thibodeau and his ability to perform hairdressing work, for four and one-half hours, on two consecutive days. The Commissioner argues that the ALJ developed the record fully on remand, as instructed by the Second Circuit's order, by inquiring in great detail about the documentation supporting Thibodeau's assertions and, specifically, questioning Thibodeau about his health during the

period of work in May 2002 and, thereafter, in order to determine whether he was able to perform work on a regular basis. According to the Commissioner, "[a]lthough [Thibodeau]'s testimony suggests that his health prevented him from engaging in a regular trade or business, the ALJ's findings with regard to [his] income and credibility are sufficient to deny insured status in this case."

In his opposition to the motion, Thibodeau contends his words "one shot deal" were taken out of context because he wrote them down after he came home from his heart surgery; what he really wanted to say was that he had two massive heart attacks and open heart surgery, which was "apparently the end of my further going into business as a hairdresser for the time being." According to Thibodeau, the surgery caused him breathing and sinus problems so he would not be able to use chemicals commonly used in his trade. Moreover, he suffers from post-operative depression. With respect to his business expenses, Thibodeau contends he still has "a boxed home permanent and hair curlers that I have supplied a picture of. And for other supplies; everyone has a comb, scissors, and a hair brush." Thibodeau maintains no discrepancy exists in the amount he earned because seven clients paid him $150 each for a total of $1,050. "Each lady (6) . . . also gave me a tip of [$]7.50, for a grand total of 1,095. . . . And the enclosed papers show that's the exact amount I earned, and that I paid income taxes on." With respect to the names of his customers, Thibodeau contends that "[n]o hairdresser would be asked personal information about the people who had paid them to do their hair." Thibodeau contends the Commissioner's motion should be denied and he should be awarded "the full relief that my accurate records show I've worked and earned." In his opposition, Thibodeau submitted evidence outside of the record, consisting of tax returns, copies of checks, pictures, an online article about post-operative depression, and his medical records from Beth Israel Medical Center

for the period between 2008 and 2010. Thibodeau stated: "My records were not interpreted as previously recorded. I wish to show why with the enclosed attachments."

In reply, the Commissioner contends that Thibodeau's medical records from 2008 to 2010 do not support his allegations that he was too ill to continue to cut hair because they are dated at least six years after the work activity at issue. Moreover, Thibodeau did not present medical evidence of his condition for the period in question, May or June 2002. The ALJ encouraged Thibodeau to explain his health as of May 2002, but Thibodeau did not offer any details except to state that he had a heart attack in the fall, before November 2, 2002. However, he testified at the original hearing that the heart attack was in December 2002. According to the Commissioner, Thibodeau's belated explanation that the discrepancy between the gross income he reported and the total earned if eight clients each paid $150 is due to income from tips of $7.50 per client, amplifies the inconsistency. The ALJ inquired about any other documentation supporting Thibodeau's claim, but Thibodeau denied having any.

## DISCUSSION

### *Legal Standard*

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. . . . The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. §405(g). To have additional evidence considered, the claimant must show that the evidence is: (1) new and not merely cumulative of what is in the record; and (2) "material, that

is, both relevant to . . . the time period for which benefits were denied and probative." Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991). Evidence is material if a reasonable possibility exists "that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." Id.

> A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted). "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (internal citation omitted).

To be eligible for retirement benefits under the Social Security Act, a person must be fully insured. This means, inter alia, that an individual "had not less than . . . 40 quarters of coverage." 42 U.S.C. § 414(a). "For an individual to have self-employment coverage under social security, the individual must be engaged in a trade or business and have net earnings from self-employment that can be counted as self-employment income for social security purposes." 20 C.F.R. § 404.1065. "Self-employment income is the amount of your net earnings from self-employment that is subject to social security tax and counted for social security benefit purposes." 20 C.F.R. § 404.1096(a). Net earnings from self-employment means, generally, gross income, derived by an individual from any trade or business carried on by that individual,

less the deductions attributed to one's trade or business that are allowed. See 42 U.S.C. § 411(a); 20 C.F.R. § 404.1080(a)(1). To be considered self-employment income, the amount earned for a taxable year cannot be less than $400. See 20 C.F.R. § 404.1096(c).

The Social Security Administration's Program Operations Manual System ("POMS"), the publicly available operating instructions for processing social security claims, assumes self-employment income reported by the claimant to be correct, unless insured status is involved. See POMS RS 01804.044, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0301804.044 (visited on June 9, 2011). POMS guidelines "represent the Commissioner's interpretation of the statutory mandate, [and] they deserve substantial deference, and will not be disturbed as long as they are reasonable and consistent with the statute." Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998). "The amount of taxable earnings a person must have to be credited with a quarter of coverage in 2002 [is] $870." 66 Fed. Reg. 54047-01 (Oct. 25, 2001). In determining the existence of a trade or business, the agency considers: (1) the good faith intention of making a profit or producing income; (2) continuity of operations, repetition of transactions, or regularity of activities; (3) regular occupation; and (4) holding out to others as being engaged in the selling of goods or services. See POMS RS 01802. 002, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802002 (visited on June 9, 2011). "A single factor is not sufficient upon which to determine the existence of a trade or business. All the factors need not apply." Id. "The burden of proving eligibility for retirement benefits is on the claimant." Social Security Ruling 86-4C (1986).

***Application of Legal Standard***

<u>New Evidence</u>

Except for copies of Thibodeau's 2002 tax return, checks and calendar, which duplicate

the evidence already in the record, all other evidence, submitted in opposition to the Commissioner's motion, is new.  That evidence consists of: (a) photographs of what appears to be an empty, undated package of "Ogilvie Conditioning Home Permanent"; (b) fuzzy photographs of what barely appears to be hairdressing supplies; (c) a 2007 online article on post-operative depression; and (d) Thibodeau's medical records from Beth Israel Medical Center, dating from 2008 to 2010.  The new medical evidence is not relevant or probative of the time period at issue, which is the period immediately following May 21, 2002, the date on which Thibodeau alleges he last performed any work activity.  The new medical evidence pertains to Thibodeau's health during a period more than six years from the period at issue.  The 2007 online article about post-operative depression is also irrelevant and not probative of Thibodeau's health in the period immediately following May 21, 2002.  Thibodeau's health in 2007 or 2008-2010 does not demonstrate whether his medical condition subsequent to May 21, 2002, caused him to terminate his alleged trade or business.  The photographs submitted are undated and Thibodeau's statement that, "[a]s for my having supplies available . . . to do hair, I still have a boxed home permanent and hair curlers," without more, does not establish that the photographs are probative of his assertion that he has kept supplies at his home since 1974.  Moreover, it does not  appear that a reasonable possibility exists that the new evidence would have influenced the ALJ to decide Thibodeau's application differently, because he never mentioned, at his hearing, that he still had supplies from 1974 at his home.  The fuzzy photographs, appearing to depict hairdressing supplies, are of such poor quality that the items depicted are barely identifiable.  Even if their quality were not at issue, it is unlikely they would be relevant or probative of any assertions Thibodeau made, as they could have been taken anywhere at any time and by anyone, and it is unlikely that a reasonable possibility exists that these photographs would have

influenced the ALJ to decide Thibodeau's application differently. Additionally, Thibodeau failed to show any reason why he did not present this evidence to the ALJ at the June 2010 hearing. Accordingly, Thibodeau's new evidence, submitted in his opposition to the Commissioner's motion, is not considered.

>Review of the ALJ's Decision

Upon remand, the ALJ complied with the directive of the Second Circuit's order by developing the record through documentary and testimonial evidence in order to: (i) cure the problem occasioned by the lack of documentation reflecting any customers Thibodeau had or the services he rendered during the time in question; and (ii) analyze the four factors required to be considered when determining the existence of a trade or business. The evidence Thibodeau submitted, namely his May and June 2002 calendar and the list of customers, were not consistent with his testimony and he was not able to explain the discrepancies noted by the ALJ. The ALJ credited Thibodeau's testimony that he held himself out as a hairdresser, but found that the documentation of the earnings from that activity did not support the finding that he undertook the work activity in May 2002 with a good faith intention of making a profit or producing an income. Thibodeau stated, on April 22, 2004, that his work activity in May 2002 was a '1 time deal," and he testified, on September 19, 2005, that his customers knew what he was trying to do with the Social Security. In light of his testimony, on June 7, 2010, that he had heart surgery "sometime between May and November 2nd," his contention, in opposition to the defendant's motion, that his words "one shot deal" were "said when I was just out of the hospital by minutes having had open heart surgery three days prior," purporting to suggest some confusion on his part, is incredible. Moreover, Thibodeau had an opportunity to explain to the ALJ any discrepancy in the record, including his 2004 assertion that his May 2002 work activity was a "1

14

time deal," but he failed to do so.  The ALJ found, correctly, that no continuity of operation, repetition of transactions, or regularity of activities existed and that Thibodeau did not have a regular occupation because he did not perform any work activity from 1974 to May 20, 2002, and after May 21, 2002.  Additionally, Thibodeau was not licensed to engage in the hairdressing business.  Thus, according to the regulations, the finding that Thibodeau held himself out as a hairdresser was not sufficient to establish that he had a trade or business in 2002.  Based on his detailed factual findings and credibility determination, the ALJ's conclusion that Thibodeau did not have a trade or business in 2002 is not contrary to law and is supported by substantial evidence.

      The ALJ did not find Thibodeau's testimony credible because it was not consistent with the evidence he presented.  For example, Thibodeau testified, repeatedly, at the hearing upon remand, that he performed work on eight customers, charging each $150, but his list of customers indicates only seven customers.  Similarly, he testified at his original hearing that Evelyn paid him $120, but he testified at the hearing upon remand that she paid him $150.  He also testified inconsistently about whether he received the payment from Evelyn before or after he prepared his 2002 tax return.  Moreover, the ALJ did not find credible Thibodeau's testimony that he did not have any business expenses because he had supplies at home, from 1974, the last year in which he performed work.  The ALJ also noted Thibodeau's "insulting, belligerent and uncooperative" behavior during the ALJ's inquiry about the discrepancies and he did not credit Thibodeau's purported lack of memory respecting the events that occurred eight years ago.  Furthermore, the ALJ rejected Thibodeau's explanation of his expenses, finding that the actual amount of expenses was questionable.  Although both, Thibodeau's 2002 tax return and his 2002 amended tax return, appear to suggest that he satisfied the amount of self-employment income

required to earn one quarter of coverage in 2002, $870, the conflicting evidence offered in support of the purported earnings and business expenses, and the unexplained discrepancies in the record support the ALJ's finding that Thibodeau did not have self-employment income in an amount sufficient to earn any quarter of coverage in 2002. The ALJ's determination that Thibodeau failed to establish that he had sufficient income to earn any quarter of coverage in 2002 is not contrary to law and is supported by substantial evidence. Accordingly, the ALJ's determination, that Thibodeau did not attain fully insured status because he failed to show that he had: (1) a trade or business in 2002; and (2) sufficient self-employment income to earn any quarter of coverage in 2002, is based on a correct application of the law and is supported by

substantial evidence.

## RECOMMENDATION

For the foregoing reasons, I recommend that the Commissioner's decision be affirmed and the Commissioner's motion for judgment on the pleadings, Docket Entry No. 11, be granted.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardaphe, 500 Pearl Street, Room 920, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 540, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Gardaphe. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
July 21, 2011

Respectfully submitted,

_____
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Mailed copies to:

Perley J. Thibodeau
Susan Colleen Branagan, Esq.